**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

VICTORIA OFORIWAH TWUMASI )
ANKRAH, on behalf of herself and others )
Similarly situated, )
            )
            Plaintiff, )
            )
v.             ) No. 1:26-cv-00666-TWT
            )
AMERICA FIRST MOVING SERVICES, )
LLC             )
            )
            )
            Defendant. )

**<u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT</u>**

## I.     INTRODUCTION

This is a factual Rule 12(b)(1) standing challenge. Plaintiff alleges Defendant violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by sending unsolicited, unwanted telemarketing texts and pre-recorded calls to her regarding a moving quote, despite having registered her number on the National Do Not Call Registry. (*See* Pl.'s Compl. at ¶¶ 28-49.)  Contrary to Plaintiff's claims, Plaintiff affirmatively provided her telephone number through an online inquiry asking to be contacted regarding moving quotes and expressly consented to be contacted in precisely the manner she complains of now. After she later replied "stop" to two marketing text messages to which she had consented, Defendant

1

acknowledged her revocation of consent to receive text messages and ceased text message communication immediately. Defendant also ceased telephone communication promptly and, according to the Plaintiff, within four days' time— well under the FCC's "reasonable time" guideline of within ten days of a revocation request. *See In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 39 F.C.C. Rcd. 1988 (2024). At bottom, Plaintiff's express consent defeats any TCPA injury and, independently, any claimed invasion of privacy is not fairly traceable to a TCPA violation.

This Court has dismissed similar TCPA claims on a comparable factual record for lack of standing. In *Hall v. Xanadu Marketing, Inc.*, the court granted a Rule 12(b)(1) motion where the defendant's declaration showed the plaintiff provided her number via a website inquiry form with an express "consent" checkbox and was able to stop messages thereafter. 682 F. Supp. 3d 1278, 1284 (N.D. Ga. 2023). The *Hall* court held there was no concrete, traceable injury and dismissed without prejudice. *Id.* at 1286. Importantly, the *Hall* court considered, but rejected, the allegations from the plaintiff's operative complaint, holding that in a factual standing challenge, the trial court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case [and] no presumptive truthfulness attaches to plaintiff's allegations[.]" *Id.* at 1285 (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)) (internal citations omitted).

Here, the Defendant's declaration and factual record included therein expressly rebuts material misrepresentations in the Plaintiff's Complaint and demonstrates that the contact that Plaintiff complains of was requested by her and ceased promptly upon her subsequent request. (Exhibit A, Geraud Decl. ¶¶ 15-27.) Thus, Plaintiff has not suffered any injury that is capable of redress by this Court and accordingly lacks standing to bring this lawsuit. Accordingly, her complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.   FACTUAL BACKGROUND

Plaintiff filed a class action complaint against Defendant America First Moving Services, LLC alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, for sending unsolicited telemarketing texts and pre-recorded calls to her regarding a moving quote, despite having registered her number on the National Do Not Call Registry. (*See* Pl.'s Compl. at ¶¶ 28-49.)  Specifically, Plaintiff asserts (1) violations of 47 U.S.C. § 227(b)(1)(B) and/or (b)(1)(A)(iii) for the Defendant's alleged sending of pre-recorded "robocalls" to her (Count I) and (2) violations of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c) for the Defendant allegedly contacting the Plaintiff while she was on the National Do Not Call Registry (Count II). (Pl.'s Compl. at ¶¶ 82-91.)

Plaintiff's Complaint further claims that the calls were "nonconsensual encounters" and she "never provided her consent or requested the calls" and "did not

3

request information or promotional materials. . ." (Pl.'s Compl. at ¶¶ 45, 47-48.) These claims, however, are demonstrably false. For all its factual allegations, Plaintiff's Complaint omits one critical fact: the *only* reason that America First ever contacted the Plaintiff was because she requested a moving quote at an affiliate partner's website— https://quote.vanlinesmove.com—and asked to be contacted. (Geraud Decl. at ¶¶ 7-8, 16-19.)

Specifically, on December 15, 2025, Plaintiff visited https://quote.vanlinesmove.com and submitted a request for information, providing her full name ("Victoria Twumasi Ankrah"), her email "(                    @gmail.com"), and her cell phone number ("        7225"), and other information, and affirmatively checked a consent box authorizing contact, including by text message using automated technology. (Geraud Decl. at ¶¶ 16-19.)

The consent disclosure displayed adjacent to the checkbox that Plaintiff clicked advised her that by checking and submitting, she was agreeing and consenting to "be contacted via telephone, email and texts by quote.vanlinesmove.com and its affiliates" and further warns that "[w]e may use an automatic dialing system or pre-recorded voice messages to contact you." (Geraud Decl. at ¶¶ 9-10.) Defendant America First is an affiliate partner of quote.vanlinesmove.com. (Geraud Decl. at ¶¶ 5, 7.) The consent clickwrap

agreement even makes it clear that: "[i]f you'd prefer not to be contacted by our partnered companies or by an automatic dialing system, pre-recorded voice message, or text message, [p]lease do not submit your phone number." (Geraud Decl. at ¶ 10.)



(Geraud Decl. at ¶ 9.) It is not possible for a consumer like Plaintiff to submit a marketing contact request or provide their phone number to the website without clicking the above clickwrap consent agreement—the website will not allow a request to be submitted until the box is checked. (Geraud Decl. at ¶ 11.)

To ensure that unwitting consumers are not contacted in error, America First's affiliate partner, Prime Marketing, then required consumer-generated moving quote inquiries made via their website, https://quote.vanlinesmove.com, to verify their cell phone numbers vis SMS verification prior to any marketing contact. (Geraud Decl. at ¶ 13.)  Thus, consumers making a web request for a moving quote *are required to first verify their phone number* by entering a code texted to them onto the website. *Id.* This process ensures that someone cannot enter another person's contact

information—only persons who have "verified" the phone number they are requesting contact on are contacted by America First. (Geraud Decl. at ¶ 13.)

Here, the Plaintiff was sent an SMS text message to her cellular telephone ending in -7225 with the unique verification code of "934" that she was prompted to enter onto the moving quote website. (Geraud Decl. at ¶¶ 18-19.) After she did, she was considered a "verified" lead and only then did America First reach out to her, sending two text messages in quick succession. (Geraud Decl. at ¶ 20.) Less than five minutes after receiving these messages, Plaintiff replied "stop" to both messages at approximately 11:58am Eastern Time. (Geraud Decl. at ¶¶ 22-23.)  Immediately following Plaintiff replying with "stop," America First send a text message confirming the Plaintiff had been opted out of SMS messaging. (Geraud Decl. at ¶¶ 22-23.) After processing Plaintiff's stop requests, America First and its affiliates ceased to send any additional text messages to her. (Geraud Decl. at ¶ 24.)

Plaintiff further alleges that after she opted out of America First's text messages by replying "stop," Defendant nevertheless still continued to contact her via pre-recorded "robocalls" dialed to her phone. (Pl.'s Compl. at ¶ 34.) She alleges that Defendant called at least five times in the approximately three-to-four-day period between December 15 and December 18, 2025, leaving voicemails advertising Defendant's moving services each time. (Pl.'s Compl. at ¶¶ 34-42.)

Plaintiff asserts that all contact by the Defendant ceased by the fourth day following when she revoked consent to be contacted. (*See* Pl.'s Compl. at ¶¶ 29-45.)

### III.    ARGUMENT

**A.    The Court Cannot Assert Subject Matter Jurisdiction Over Plaintiff's Claims Because Plaintiff Does Not Have Standing.**

#### 1.    Rule 12(b)(1) Legal Standard.

A challenge to a plaintiff's Article III standing is properly raised under Federal Rule of Civil Procedure 12(b)(1). *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). A plaintiff's failure to allege an injury fairly traceable to the defendant defeats Article III standing, and because standing is a jurisdictional prerequisite, that defect requires dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1). *See Stalley,* 524 F.3d at 1232.

In attacking standing, a Rule 12(b)(1) motion may present either a facial or a factual attack on subject-matter jurisdiction. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). In a facial attack, the court evaluates whether the complaint sufficiently alleges a basis for jurisdiction and accepts the allegations as true. *Id.* In contrast, a factual attack challenges jurisdiction in fact, permitting the court to consider evidence outside the pleadings, weigh competing proof, and make independent findings as to its jurisdictional authority without presuming the truth of the plaintiff's allegations. *Id.; Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230

7

(11th Cir. 2021); *Gardner v. Mutz*, 962 F.3d 1329, 1340 (11th Cir. 2020). In resolving a factual attack, the court is not required to view the evidence in the light most favorable to the plaintiff. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336 (11th Cir. 2013). "The district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Hall v. Xanadu Mktg., Inc.,* 682 F. Supp. 3d 1278, 1283 (N.D. Ga. 2023) (citing *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.,* 501 F.3d 1244, 1251 (11th Cir. 2007) (citation omitted)).

To establish standing, the plaintiff bears the burden of demonstrating (1) a concrete and particularized injury in fact, (2) that is fairly traceable to the defendant's challenged conduct, and (3) that is likely to be redressed by a favorable decision. *Stalley*, 524 F.3d at 1232. This burden rests with the party invoking federal jurisdiction and must be supported with competent evidence where jurisdiction is factually contested. *Lawrence*, 919 F.2d at 1529.

In the TCPA context, these principles are critical to the traceability inquiry. Even where a plaintiff alleges receipt of unwanted communications, standing fails if the alleged injury is not fairly traceable to unlawful conduct by the defendant—such as where the plaintiff provided prior express consent or where the defendant

reasonably complied with a revocation of consent. *See Hall v. Xanadu Mktg., Inc.,* 682 F. Supp. 3d 1278, 1281–82 (N.D. Ga. 2023); *Stalley*, 524 F.3d at 1232 (traceability required). Accordingly, where, like here, evidence shows that the complained-of communications were authorized or promptly ceased upon revocation, a Rule 12(b)(1) factual attack permits the Court to determine that subject matter jurisdiction does not exist because Plaintiff has not suffered an Article III injury fairly traceable to a TCPA violation.

### 2. Plaintiff Cannot Factually Establish Subject Matter Jurisdiction Because She Suffered No Injury in Fact.

Plaintiff lacks subject matter jurisdiction because she suffered no injury in fact. First, by submitting her phone number online for moving quotes, Plaintiff consented to be contacted, negating any claim of concrete injury considering that she initiated, and expressly consented to, the contact about which she now complains. Second, America First promptly ceased contact within four days—well within the FCC's ten-day guideline—after Plaintiff revoked her consent, further eliminating any basis for concluding that Plaintiff suffered an injury.

### A. Plaintiff Consented to Be Contacted When She Submitted Her Phone Number Online for Moving Quotes, Defeating Any Concrete Injury.

Plaintiff's Complaint is conspicuously absent of a critical threshold fact in this case: that she was *only* contacted by Defendant because she first requested moving

quotes online and consented to be contacted for this express purpose, including providing and then verifying her telephone number to facilitate that contact. (*Compare* Pl.'s Compl. *with* Geraud Decl. ¶¶ 16-19.) Not only does Plaintiff's Complaint fail to mention this fact, but it also affirmatively misstates the truth: it claims that "Plaintiff never provided her consent or requested the calls" and that she "did not request information or promotional materials. . ." (Pl.'s Compl. at ¶¶ 47-48.) This is categorically false. Plaintiff's own pleading acknowledges the first text she received from the Defendant "follow[ed] up on the online inquiry [she] recently submitted" regarding a moving quote. (*See* Pl.'s Compl. at ¶ 32). America First's evidence confirms she provided her number and agreed to be contacted via a clickwrap consent. (Geraud Decl. at ¶¶ 6-12, 16-19.) As shown below, Plaintiff's consent defeats any argument that she suffered an Article III injury. *See Hall v. Xanadu Mktg., Inc.,* 682 F. Supp. 3d 1278, 1282 (N.D. Ga. 2023).

Providing a cellular telephone number to a company "qualifies as prior express consent under the TCPA[.]" *Lawrence v. Bayview Loan Servicing, LLC*, 666 F. App'x 875, 881 (11th Cir. 2016). The Eleventh Circuit has recognized that the FCC itself has made clear that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *Murphy v. DCI Biologicals Orlando, LLC*. 797 F.3d 1302, 1306 (11th Cir. 2015) (citing *In the Matter of Rules*

*& Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752 (1992)).

In *Hall v. Xanadu Mktg., Inc.*, District Judge Cohen dismissed a TCPA claim under Rule 12(b)(1) where the defendant's extrinsic evidence established the plaintiff's prior consent and ability to opt out, demonstrating the absence of a concrete, traceable injury, and therefore a lack of Article III standing. 682 F. Supp. 3d 1278, 1286 (N.D. Ga. 2023).

In so finding, the district court considered that the plaintiff's providing a phone number to a website "qualifies as prior express consent" and recognized "prior express consent is an affirmative defense against TCPA claims." *Id. at* 1285. The *Hall* court ultimately credited the defendant's unchallenged declaration that the plaintiff consented to the contact complained of—even despite the fact the plaintiff's complaint failed to mention that she had requested the contact at issue. *Id; see Hall v. Xanadu Mktg., Inc.*, No. 1:22-CV-3795-MHC, ECF Nos. 1, 4, 13, 20, 34. Like here, the *Hall* record considered by the district court included the website's consent language to which plaintiff had agreed. (*See Hall,* 682 F. Supp. 3d at 1283, Geraud Decl. at ¶¶ 8-10.) Specifically, the *Hall* defendant and America First's consent agreements both included terms that (1) authorized contact via telephone or text message, including by automated means; and (2) included consent to be contacted by affiliates and partners as well. *Id.* The *Hall* court relied on these facts in finding

11

the plaintiff had not suffered a concrete injury traceable to the defendant. *Hall,* 682 F. Supp. 3d at 1286.

Here, as in *Hall*, Plaintiff's consent to receive follow-up communications about a moving quote she herself requested negates her claim of injury. The only reason that Defendant America First had her phone number and contacted her about moving quotes was because Plaintiff first visited a moving quote website seeking moving quote information (https://quote.vanlinesmove.com/), provided her contact information including her telephone (and then verified her telephone number with the website), and consented to be contacted by moving companies like Defendant. (Geraud Decl. at ¶¶ 16-19.)

Irrespective of whether she is on the Do Not Call Registry, Plaintiff Ankrah expressly consented to be contacted by "telephone, email, and texts by quote.vanlinesmove.com and its affiliates." (Geraud Decl. at ¶¶ 8-9.) In fact, as a condition precedent to her even submitting her phone number to be contacted, she was *required* to acknowledge her express consent by checking the following clickwrap agreement:

12



(Geraud Decl. at ¶¶ 9-10.) Then, after consenting to being contacted, she also had to verify her phone number by entering a 3-digit phone number sent via text message into the moving quote website to ensure that she was in possession of the phone whose number she had entered. (Geraud Decl. at ¶¶ 18-19.) In finding that the plaintiff consented to the contact complained of, the *Hall* court relied on nearly identical consent language in which the consumer expressly granted consent to "the site and their partners'" to contact her via email or telephone to any provided wireless number, including using automated technology. *Hall,* 682 F. Supp. 3d at 1283. So too here. Plaintiff's consent to America First's contacting her forecloses any claim that she was subsequently injured by her own request, and thus she cannot prove harm. Accordingly, the Court should dismiss her claim.

        B.      <u>America First Promptly Ceased Contacting Plaintiff After She Revoked Her Consent, Well Within the FCC's Established Ten-Day Guideline for Implementing Revocation.</u>

Plaintiff's TCPA claim also fails because she cannot establish a cognizable injury fairly traceable to any *unlawful conduct*. Even accepting Plaintiff's allegations

as true, Defendant undisputedly ceased all contact within four days of her purported revocation—well within the timeframe identified by the FCC. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 39 F.C.C. Rcd. 1988 (2024). Accordingly, Defendant's conduct as pled does not constitute unlawful conduct sufficient to confer Article III standing.

The FCC's 2024 amendments to 47 C.F.R. § 64.1200 codify that all revocation requests made by any reasonable method "must be honored within a reasonable time not to exceed ten business days from receipt." 47 C.F.R. § 64.1200 (a)(10). In adopting this standard, the Commission expressly framed the ten-business-day period as the outer limit for compliant processing and emphasized that honoring revocation requests should be "swift," reflecting the availability of automated processing. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 39 F.C.C. Rcd. 1988 (2024). However, the Commission expressly rejected a shorter proposed 24-hour timeframe, acknowledging that a "longer timeframe justified to ensure that entities, including smaller entities" like America First "have a reasonable opportunity to process do-not-call and revocation requests." (*Id.* at ¶ 21.) In fact, the Commission expressly made the timeframe to comply stricter for other industries. (*See Id.* at ¶ 23) (holding that opt-out requests must be honored *within six days* for package delivery companies.) In other words,

14

the regulation defines the outer boundary of lawful conduct and confirms that some brief processing period is both anticipated and permissible.[1]

Against this regulatory backdrop, Plaintiff's jurisdictional theory fails because there is no concrete injury where, upon revocation, the caller ceases communications within the Commission's expressly recognized implementation period. The FCC's codified ten-business-day ceiling defines the outer bounds of reasonable compliance time. Here, Defendant acted promptly after receiving Plaintiff's revocation and—according to Plaintiff herself—completed implementation within just four days, well below the ten-business-day rule. (*See* Pl.'s Compl. at ¶¶ 34-39.) Thus, Plaintiff's complaint fails to allege unreasonable conduct that facially violates the TCPA, and Plaintiff has not pleaded any other facts that suggest that this brief processing period will support a TCPA claim. Accordingly, Plaintiff's Complaint fails to plead facts sufficient to demonstrate injury and forecloses any plausible allegation of ongoing harm sufficient to invoke this Court's subject-matter jurisdiction under Rule 12(b)(1).

---

[1] The rule became effective April 11, 2025, *see In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, No. CG02-278, 2025 WL 1077219, at *2 (OHMSV Apr. 7, 2025), and no court that America First is aware of has yet interpreted whether calls made during the processing window give rise to liability. Moreover, the FCC's order is silent on any safe harbor, confirming only the deadline by which revocations must be implemented. *Id.*

This defect is not merely merits-based—it is jurisdictional. To establish standing, Plaintiff must show a concrete injury fairly traceable to Defendant's challenged conduct. Where Defendant acted within the bounds of governing law, any alleged harm is not traceable to unlawful conduct and therefore cannot support Article III standing. See *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008). In the TCPA context, the Eleventh Circuit has repeatedly dismissed claims for lack of standing where the alleged statutory violation does not result in a concrete, traceable injury. *See, e.g., Grigorian v. FCA US LLC,* 838 F. App'x 390, 394 (11th Cir. 2020) (ringless voice mails, like text messages, do not amount to injury in fact because they do not result in material loss of time, render the device unavailable, cause the recipient to incur charges, or require the recipient's immediate attention); *see also Jenkins v. Simply Healthcare Plans, Inc.,* 479 F. Supp. 3d 1282, 1285 (S.D. Fla. 2020) (no harm where defendant received an unsolicited text message); *Eldridge v. Pet Supermarket Inc.,* 446 F. Supp. 3d 1063, 1070 (S.D. Fla. 2020) (no standing for TCPA for five text messages sent without consent).

That is precisely the case here. Plaintiff does not—and cannot—allege that Defendant continued contacting her after implementing her revocation.[2] At most,

---

[2] The Court may also consider that Plaintiff's "revocation" (per the Complaint) was limited to a text response. Plaintiff provides no allegation that she provided any other revocation with respect to the calls or automated messages that she had consented to

Plaintiff attempts to impose liability for conduct occurring during a brief, reasonable implementation period expressly contemplated by federal regulation. That theory, without more, fails. Because Defendant complied with § 64.1200(a)(10) and the Plaintiff has not plead any facts that would make the four days it allegedly took for Defendant to comply with her revocation request unreasonable as a matter of law, Plaintiff cannot establish that any alleged injury is fairly traceable to unlawful conduct, and this Court therefore lacks subject-matter jurisdiction. Dismissal under Rule 12(b)(1) is required.

## IV.  CONCLUSION

In light of the foregoing, the Court should dismiss Plaintiff's Complaint for lack of subject matter jurisdiction under Rule 12(b)(1).

Respectfully submitted this 20th day of April, 2026.

**KABAT CHAPMAN & OZMER LLP**

*/s/ Aaron A. Wagner*
Aaron A. Wagner
Georgia Bar No. 867812
awagner@kcozlaw.com
Nathan D. Chapman
Georgia Bar No. 244945
nchapman@kcozlaw.com
KABAT CHAPMAN & OZMER LLP
171 17th Street NW, Suite 1550

---

receive. Under those facts, Defendant's prompt action to expand her revocation across all mediums—even when not expressly asked to do so—is even more reasonable.

17

Atlanta, Georgia 30363
Tel: (404) 400-7300
Fax: (404) 400-7333
*Attorneys for Defendant*

18

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| VICTORIA OFORIWAH TWUMASI ANKRAH, on behalf of herself and others Similarly situated, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:26-cv-00666-TWT |
| | ) |
| AMERICA FIRST MOVING SERVICES, LLC | ) ) ) |
| | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF MICHEL GERAUD

Pursuant to 28 U.S.C. § 1746, the undersigned hereby declares as follows:

1.    I am the Manager of Defendant America First Moving Services, LLC ("America First"). I am over the age of eighteen and of sound mind, and I am fully competent to make this Declaration. The matters set forth in in this Declaration are based upon my personal knowledge, including knowledge based upon corporate records and data withing my custody and control and the knowledge gained from reviewing the corporate records of America First and its affiliate partners, which are maintained in the ordinary course of business.  If called as a witness, I could and would testify competently to the facts stated herein.

1

2.      I submit this declaration in support of Defendant America First's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

## Company Consent Policies and Procedures

3.      I am the Manager of America First Moving Services, LLC. In that capacity, I am familiar with the consumer-facing website we operate, and the websites operated by our affiliate partners.

4.      America First generates internet marketing leads from two primary sources: (1) via consumer leads generated from our own website, americafirstmoving.com, and (2) via consumer leads generated by our affiliate marketing partners, including Prime Marketing LLC.

5.      Our affiliate partner Prime Marketing LLC operates the moving marketing website https://quote.vanlinesmove.com/.

6.      America First and its affiliates maintain policies and procedures designed to ensure that it and any affiliates contact only those consumers who have provided consent and that any consumer's request to cease communications is honored promptly.

7.      In the present case, the Plaintiff initiated consent to be contacted by requesting a moving quote on https://quote.vanlinesmove.com/, an affiliate partner of America First.

2

8.      Specifically, the Plaintiff filled out information seeking a moving quote at the https://quote.vanlinesmove.com/ webpage.

9.      Prior to collecting a consumer's contact information and initiating contact by itself or a third-party affiliate like America First, Prime Marketing requires consumer to enter into a "clickwrap" agreement consenting to future contact in the manner described in the clickwrap agreement shown here:

10.     The consent disclosure displayed adjacent to the checkbox that Plaintiff clicked advises that by checking and submitting, the consumer agrees and consents to "be contacted via telephone, email and texts by quote.vanlinesmove.com and its affiliates" and further warns that "[w]e may use an automatic dialing system or pre-recorded voice messages to contact you. If you'd prefer not to be contacted by our partnered companies or by an automatic dialing system, pre-recorded voice message, or text message, [p]lease do not submit your phone number."

3

11.   It is not possible for a consumer to submit a marketing contact request or provide their phone number to the website without clicking the above clickwrap consent agreement.

12.   Here, America First only contacted the Plaintiff after she entered her contact information in our affiliate partner's website and consented to be contacted.

13.   During the timeframe when Plaintiff requested a moving quote, in order to further ensure that unwitting consumers are not contacted in error, America First's affiliate partner, Prime Marketing, required consumer-generated moving quote inquiries made via their website, https://quote.vanlinesmove.com, to verify their cell phone numbers vis SMS verification prior to any marketing contact. Thus, consumers making a web request for a moving quote *must first verify their phone number* by entering a code texted to them onto the website. This process ensures that someone cannot enter another person's contact information—only persons who have "verified" the phone number they are requesting contact on are contacted by America First.

14.   America First maintains and trains personnel on internal do-not-contact procedures, records and honors opt-out requests in real time, and maintains logs evidencing consent, message delivery, and cessation upon opt-out.

15.   If a consumer who has previously made a request for a quote and consented to be contacted ever revokes that consent, the consumer's phone number

4

is immediately and automatically placed on the internal Do Not Call list of America First. The consumer's phone number remains on the Do Not Call list unless or until the consumer affirmatively consents to receive communications from America First at a later date.

<b>Timeline of Interactions With Plaintiff</b>

16.    On December 15, 2025, Plaintiff Victoria Ankrah visited https://quote.vanlinesmove.com/ and submitted a request for information, providing her full name ("Victoria Twumasi Ankrah"), her email "(███████████@gmail.com"), and her cell phone number ("████ 7225") and other information, and affirmatively checked the consent box authorizing contact, including by text message using automated technology.

17.    A copy of the information that the Plaintiff entered into the moving quote website is as follows, excerpted from website data record logs:

anding_page_url" : "https://quote.vanlinesmove.com/Moving_Company/",
 "state_click" : "2",
 "moving_size" : "0",
 "from_state" : "CA",
 "from_city" : "los angeles",
 "from_zip" : "90001",
 "from_areacode" : "323",
 "move_date" : "2026-02-26",
 "to_state" : "GA",
 "to_city" : "atlanta",
 "to_areacode" : "404",
 "to_zip" : "30301",
 "email" : "███████████@gmail.com",
 "last_name" : "TwumasiAnkrah",
 "first_name" : "Victoria",
 "code" : "934",
 "phone" : "████7225",
 "verifyvia" : "sms",
 "is_verify" : "1",

5

18.     Prior to sending Plaintiff Ankrah any marketing communications, Prime Marketing sent Ms. Ankrah an SMS verification text message to the phone number she provided, prompting her to enter a unique, randomly-generated numeric code into the https://quote.vanlinesmove.com website to confirm that she was in custody and control of the phone number she had provided. To wit, she was sent a text message with the unique verification code of "934."

19.     In response to that verification message, Plaintiff Ankrah entered the verification code she was sent—934—into the moving quote website, confirming her cell phone number was ██████7225. The metadata associated with that SMS text confirmation is as follows:

"email" : "████████████████@gmail.com",
"last_name" : "TwumasiAnkrah",
"first_name" : "Victoria",
"code" : "934",
"phone" : "██████7225",
"verifyvia" : "sms",
"is_verify" : "1",

20.     Following this submission, Defendant America First sent two text messages to the provided phone number on Monday, December 15, 2025, consistent with the disclosure it provided, and which Plaintiff consented to.

21.     The first message was sent at 11:55am Eastern Time and read: "Hello Victoria, [m]y name is Blake with America First Moving. I'm reaching out to follow

6

up on the online inquiry you recently submitted in regard[] to your upcoming move

to Atlanta. I'd like to assist you in confirming availability and providing you with a

quote tailored to your needs. Please give me a call to discuss the details of your

move. I look forward to speaking with you!"



22.    On December 15, 2025, at 11:58am Eastern Time, the Plaintiff replied

to the first text message she solicited with the word "stop." Within seconds, our

system automatically processed the opt-out and returned a confirmation text message

that the number had been opted out, stating: "Thank you for opting-out of SMS

messages from American Van Lines of SF LLC. To opt back in at any time reply

START."



Thank you for opting-out of SMS messages from American Van lines of SF LLC. To opt back in at any time reply START.

23.    Around the same time as the first text message, a second text message was sent to Plaintiff from short code 87512. The Plaintiff replied "stop" to the second message at 11:58am Eastern Time, and her opt-out was immediately acknowledged via text reply.

24.    After processing the Plaintiff's second stop request, America First and its affiliates ceased sending any further text messages to that number. System logs reflect the immediate opt-out event and the absence of any subsequent text message outreach from America First to that number.

25.    At all times relevant to the allegations of this Complaint, America First honored Plaintiff's opt-out immediately and did not send additional text messages to Plaintiff after the opt-out confirmation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 20 of April, 2026, at Deerfield Beach, Florida.

_____
Michel Geraud

8